## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PAUL GERBINO, individually and on behalf of  )
all others similarly situated,  )
  )
        Plaintiff,  )
  )  Case No. __12-cv-2722__ CM/KMH
      v.  )
  )  **JURY TRIAL DEMANDED**
SPRINT NEXTEL CORPORATION, ROBERT  )
R. BENNETT, GORDON M. BETHUNE,  )
LARRY S. GLASSCOCK, JAMES H. HANCE,  )
JR., DANIEL R. HESSE, V. JANET HILL,  )
FRANK IANNA, SVEN-CHRISTER  )
NILSSON, WILLIAM R. NUTI, RODNEY  )
O'NEAL,  STARBURST I, INC., STARBURST  )
II, INC.,  and STARBURST III, INC.,  )
  )
        Defendants.  )

## CLASS ACTION COMPLAINT
## FOR BREACH OF FIDUCIARY DUTY

Plaintiff, by his attorneys, alleges the following on information and belief, except for his own acts, which are alleged on knowledge.

1.      Plaintiff brings this class action on behalf of the public stockholders of Sprint Nextel Corporation ("Sprint" or the "Company") against the members of Sprint's Board of Directors (the "Board" or the "Individual Defendants") and certain affiliated entities of SoftBank Corporation (collectively with non-Defendant SoftBank Corporation, "SoftBank").  This matter arises out of the Individual Defendants' agreement to effect a combination of the Company with SoftBank for an unfair price and pursuant to an unfair process.  In pursuing this combination, the defendants violated applicable law by either directly breaching or aiding and abetting the other defendants' breaches of their fiduciary duties as owed to Sprint's shareholders.

2.     On October 15, 2012, the Company announced a definitive agreement under which Starburst II, Inc. the wholly-owned American subsidiary of SoftBank Corporation, will merge with and into the Company, with the Company surviving the merger as a wholly-owned subsidiary of Starburst II, Inc. (the "Merger").  Pursuant to the merger, which is structuring the transaction as a bond purchase (the "Bond Purchase") and reverse merger (the "Proposed Transaction"), SoftBank Corporation, through its wholly-owned American subsidiary Starburst II, Inc. will invest $3.1 billion in a newly-issued Sprint convertible senior bond. Following stockholder and regulatory approval, SoftBank will further capitalize Starburst II, Inc. with an additional $17 billion and effect a reverse merger with Sprint in which Starburst II, Inc. will become a publicly traded company named Sprint Corporation ("New Sprint"). Of the $17 billion, $4.9 billion will be used to purchase newly issued common shares of New Sprint at $5.25 per share. The remaining $12.1 billion will be distributed to Sprint stockholders in exchange for approximately 55% of currently outstanding shares. The other 45% of currently outstanding shares will convert into shares of New Sprint. SoftBank will also receive a warrant to purchase 55 million additional Sprint shares at an exercise price of $5.25 per share.

3.     Pursuant to the merger, holders of outstanding shares of Sprint common stock will have the right to elect between receiving $7.30 per Sprint share or one share of New Sprint stock per Sprint share. This transaction will result in SoftBank owning 69.6% and Sprint shareholders owning approximately 30.4% of the shares of the combined post-merger entity. This combined entity will be renamed Sprint Corporation and operated from Sprint's current corporate headquarters in Overland Park, Kansas. The Proposed Transaction is expected to close by the second quarter of 2013.

4.     As described in more detail below, the Board members have breached their fiduciary duties by agreeing to the Proposed Transaction for inadequate consideration and by means of an unfair process rife with conflicts of interest.

5.     While the Company's shareholders are losing significant control and voting power of their company, and are in part being cashed out, in an unfair deal, the Company's officers and directors have procured for themselves unique benefits.  SoftBank has stated that they intend to retain key members of Sprint's Board and management in the combined entity.

6.     The Individual Defendants have also agreed to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company in an effort to protect the executive officers' and directors' post-combination positions.  Pursuant to the Merger Agreement, dated October 15, 2012 defendants have agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a provision allowing SoftBank access to any rival bidder's information; and (iii) a termination fee of $600 million, in addition to up to $75 million in expenses, an amount that must be paid even if defendants are ultimately presented with a superior offer. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Sprint.

7.     The Individual Defendants have breached their fiduciary duties of loyalty, due care, independence, good faith and fair dealing, and Sprint and the SoftBank Subsidiaries have aided and abetted such breaches by Sprint's officers and directors.  Plaintiff seeks to enjoin the Proposed Transaction unless and/or until defendants cure their breaches of fiduciary duty, or in

the alternative, rescission of, to the extent already implemented, the Merger Agreement or any of the terms thereof.

## JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  All Defendants are completely diverse from Plaintiff. The amount in controversy exceeds $75,000.00.

9.      The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

11.      Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Sprint.  Plaintiff is a citizen of the state of New Jersey.

12.      Sprint is a corporation organized and existing under the laws of the State of Kansas.  It maintains its principal executive offices at 6200 Sprint Parkway, Overland Park, Kansas 66251. The Company is a leading American mobile phone service provider, and with

over 56 million subscribers operates the third-largest mobile telecommunications network in the country.

      13.    Defendant Daniel R. Hesse ("Hesse") has served as Chief Executive Officer ("CEO") and a director of the Company since 2007. Upon information and belief, he is a citizen of Missouri.

      14.    Defendant James H. Hance, Jr. ("Hance") has been a director of the Company since 2005 and is the current Chairman of the Board. Upon information and belief, he is a citizen of Florida and/or Massachusetts.

      15.    Defendant Robert R. Bennett ("Bennett") has been a director of the Company since 2006. Upon information and belief he is a citizen of Colorado.

      16.    Defendant Gordon M. Bethune ("Bethune") has been a director of the Company since 2004. Upon information and belief he is a citizen of Texas.

      17.    Defendant Larry C. Glasscock ("Glasscock") has been a director of the Company since 2007. Upon information and belief he is a citizen of Florida.

      18.    Defendant V. Janet Hill ("Hill") has been a director of the Company since 2005. Upon information and belief she is a citizen of Virginia.

      19.    Defendant Frank Ianna ("Ianna") has been a director of the Company since 2009. Upon information and belief he is a citizen of New York.

      20.    Defendant Sven-Christer Nilsson ("Nilsson") has been a director of the Company since 2008. Upon information and belief he is a citizen of Sweden.

      21.    Defendant William R. Nuti ("Nuti") has been a director of the Company since 2008. Upon information and belief he is a citizen of New York.

22.     Defendant Rodney O'Neal ("O'Neal") has been a director of the Company since 2007. Upon information and belief he is a citizen of Michigan.

23.     Defendants referenced in ¶¶ 13 through 22 are collectively referred to as the previously-defined Individual Defendants and/or the Board.

24.     Defendant Starburst I, Inc. is a Delaware corporation and a wholly-owned subsidiary of SoftBank, created with the purpose of effectuating the Proposed Transaction, and with its headquarters at 38 Glen Avenue, Newton, Massachusetts 02459.

25.     Defendant Starburst II, Inc. is a Delaware corporation and a wholly-owned subsidiary of SoftBank, created with the purpose of effectuating the Proposed Transaction, and with its headquarters at 38 Glen Avenue, Newton, Massachusetts 02459.

26.     Defendant Starburst III, Inc. is a Kansas corporation and a wholly-owned subsidiary of Starburst II, Inc., itself a wholly-owned subsidiary of SoftBank, created with the purpose of effectuating the Proposed Transaction, and with its headquarters at 38 Glen Avenue, Newton, Massachusetts 02459.

27.     Non-Defendant SoftBank Corporation is a Japanese corporation with its headquarters in Tokyo, Japan. SoftBank Corporation provides broadband, fixed-line, broadmedia and internet telecommunications products and services for consumers, among other operations.

28.     The parties referenced in ¶¶ 24 through 27 are collectively referred to as "SoftBank."

29.     Defendants references in ¶¶ 24 through 26 are collectively referred to as the "SoftBank Subsidiaries."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

30.     By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of Sprint and owe them, as well as the Company, a duty of care, loyalty, good faith, candor, and independence.

31.     To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     Adversely affects the value provided to the corporation's shareholders;

(b)     Favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     Adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(d)     Will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

32.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)     Participating in any transaction where the Individual Defendants' loyalties are divided;

(b)     Participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     Unjustly enriching themselves at the expense or to the detriment of the public shareholders.

33.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of care, loyalty, good faith, and independence owed to Plaintiff and other public shareholders of Sprint.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Sprint common stock and their successors in interest, except defendants and their affiliates (the "Class").

35.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of November 5, 2012, Sprint has approximately 3.0 billion common shares outstanding.

(b)     Questions of law and fact are common to the Class, including, *inter alia*, the following:

(i)     Have the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(ii)     Have the Individual Defendants breached their fiduciary duty to secure and obtain the best deal reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii)     Have the Individual Defendants breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(iv)     Have the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(v)     Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated;

(vi)     Have Sprint or the SoftBank Subsidiaries aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(vii)     Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(g)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter,

be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Defendants have acted, or refused to act, on grounds generally applicable, and are causing injury to the Class and, therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

## FURTHER SUBSTANTIVE ALLEGATIONS

*Background*

36.     Sprint is the third-largest wireless and broadband mobile communications provider in the United States, behind Verizon Wireless and AT&T.  Founded in 1937, the Company has over 56 million active subscribers, and provides its wireless broadband mobile services across the United States.

37.     Since its 1995 acquisition of Centel Corporation, which introduced Sprint into the wireless market, Sprint has been a pioneer in providing prepaid and no-annual-contract wireless communications services to its customers, revolutionizing the telecommunications industry over the years.  Sprint's wholly-owned subsidiaries Boost Mobile and Virgin Mobile remain two of the most popular low-cost providers of prepaid wireless communications in the United States.

38.     Sprint has also been at the forefront in building the nation's first all digital, fiber optic network, the first nationwide digital PCS service, and the first nationwide push-to-talk iDEN service.  Sprint was also the first national carrier to provide wireless 4G service to its customers.   These initiatives have been among the most successful in Sprint's history, positioning the Company to its current leading position in the telecommunications industry and its No. 1 position among all national carriers in customer satisfaction during the last four years, according to the American Customer Satisfaction Index

39.     As a result of Sprint's technological innovation, and its continued diversification of its product line, especially with its pioneering role in the 4G market, Sprint has been performing extraordinarily well recently.   On July 26, 2012, Sprint issued a press release announcing its financial results for the second quarter of 2012.   Among the financial highlights, the Company announced:

- Best ever Sprint platform postpaid ARPU of $63.38 drives Sprint platform wireless service revenue growth of 16 percent year-over-year

- Best ever Sprint platform postpaid churn of 1.69 percent

- Continued strong iPhone sales of nearly 1.5 million – 40 percent to new postpaid customers

- Launched 4G LTE in five major markets and 15 cities on July 15

- Continue to expect 12,000 sites on air by the end of 2012

- 60 percent of postpaid subscribers leaving Nextel platform recaptured on Sprint platform

- Adjusted OIBDA  of $1.45 billion increases 10 percent year-over-year and includes Network Vision and iPhone dilution

- Year-over-year increase in Adjusted OIBDA is the highest in more than five years

- Sequential quarterly increase in Adjusted OIBDA of 20 percent

- Wireless retail service revenues of $7.2 billion for the quarter representing an increase of 7 percent compared to the second quarter of 2011

- 2012 Adjusted OIBDA* forecast increased to between $4.5 billion and $4.6 billion

- Quarterly wholesale, affiliate and other revenues of $124 million increased by $70 million, compared to the year-ago period and increased by $21 million sequentially, resulting primarily from growth in MVNOs reselling prepaid services

40.     In the press release, Individual Defendant Hesse noted the substantial success of Sprint in  improving revenue growth and the increasingly positive outlook for the future:

The Sprint platform achieved best ever postpaid ARPU and customer churn that, combined with disciplined customer acquisition and cost management, contributed to our Adjusted OIBDA of $1.45 billion.

Based on this performance, we are raising the 2012 Adjusted OIBDA forecast to between $4.5 billion and $4.6 billion.

41.     On October 25 2012, Sprint issued a press release announcing its financial results for the third quarter of 2012.  Among the financial highlights, the Company announced:

- Sprint platform wireless service revenue growth of 14 percent year-over-year; eighth consecutive quarter of double digit percentage year-over-year growth

- Nearly 900,000 Sprint platform net additions

- Sprint platform postpaid ARPU growth of 5 percent year-over-year

- Best ever third quarter for both Sprint platform postpaid churn of 1.88 percent and Sprint platform prepaid churn of 2.93 percent

- Continued high postpaid Nextel recapture rate of 59 percent

- Strong total iPhone sales of approximately 1.5 million – 40 percent to new customers

- 4G LTE now launched in 32 cities with over 115 more expected in coming months

- Wireless retail service revenues of $7.2 billion for the quarter representing an increase of nearly 5 percent compared to the third quarter of 2011

42.     In the press release, Individual Defendant Hesse noted the Company's poise  for "robust revenue growth":

The Sprint platform performed well, with strong net subscriber additions, record third quarter postpaid and prepaid churn and robust revenue growth, contributing to Adjusted OIBDA of $1.28 billion even as we continue to invest in Network Vision and position the company for future growth.

As a result, we believe we will slightly exceed the top of the range of our recently increased Adjusted OIBDA forecast.

*The Inadequacy of the Proposed Transaction*

43.    Despite the Company's recent strong performance and positioning for robust growth, in a press release dated October 15, 2012, the Company announced that it had entered into a Merger Agreement with SoftBank, pursuant to which SoftBank Corporation, through its affiliated entities, would acquire a 69.6% stake in a combined entity with Sprint, with Sprint shareholders remaining with a 30.4% stake.  This complex transaction would be effectuated through a bond purchase and reverse merger. As part of the bond purchase, SoftBank Corporation, through its wholly-owned American subsidiary Starburst II, Inc. will invest $3.1 billion in a newly-issued Sprint convertible senior bond. Following stockholder and regulatory approval, SoftBank will further capitalize Starburst II, Inc. with an additional $17 billion and effect a reverse merger with Sprint in which Starburst II, Inc. will become a publicly traded company named Sprint Corporation, also to be known as "New Sprint." Of the $17 billion, $4.9 billion would be used to purchase newly issued common shares of New Sprint at $5.25 per share. The remaining $12.1 billion would be distributed to Sprint stockholders in exchange for approximately 55% of currently outstanding shares. The other 45% of currently outstanding shares would convert into shares of New Sprint. SoftBank would also receive a warrant to purchase 55 million additional Sprint shares at an exercise price of $5.25 per share. Pursuant to the merger, holders of outstanding shares of Sprint common stock will have the right to elect between receiving $7.30 per Sprint share or one share of New Sprint stock per Sprint share.

44.    Given the Company's recent strong performance and its positioning for growth, the Proposed Transaction consideration is grossly unfair and significantly undervalues the Company.

13

45.     In fact, SoftBank is attempting to acquire the Company at the most opportune time, when Sprint shares are trading at artificially deflated prices.

46.     In light of Sprint's significant poise for future growth, especially with its expansion into the 4G market, Nomura Securities on September 10, 2012 lifted its rating on Sprint shares from *Neutral* to *Buy*, setting a target price of $7.00, significantly above the then-prevailing share price of $5.03 a share, and almost triple the $2.50 a share target price it had previously set for the Company.

47.     In upping Sprint's target price, Nomura Securities analyst Mike McCormack noted that sold execution on the company's Network Vision buildout plan "increases credibility on the entire project, including the ability for Sprint to lower operating expenses." McCormack added:

> We believe Network Vision cost saving prospects are gaining increased credibility, competitive risks are overstated, and that shares offer substantial upside with any margin improvement. While shares have risen 115% year to date, we believe valuation remains compelling on our improved expectations.
>
> We see the U.S. market as a bifurcated environment, with AT&T and Verizon operating at superior scale versus all other participants. Among the sub-scale providers, we believe Sprint is taking the proper actions to improve margins and compete effectively. Refreshed competitor wireless plans show that there is little appetite for aggressive price competition. Lower industry churn rates, in aggregate, highlight what we see as a more benign competitive environment across all carriers.

48.     Additionally, as reported by *Reuters,* a fund manager at T. Rowe Price, a top-15 Sprint shareholder, had projected one week before the deal was announced that Sprint would be worth $10 a share in 18 months.

49.     Most importantly, the Proposed Transaction fails to adequately compensate Sprint's shareholders for the significant benefits that SoftBank will receive from the merger.

50.     As described in an October 17, 2012 analysis by *Seeking Alpha* on the deal, with SoftBank's acquisition of Sprint, the Japanese company "gains entry into the U.S. market." In fact, before the announcement of the merger, Japan's leading national newspaper, *Nikkei,* reported that SoftBank hopes to use the acquisition as a base for entering the U.S. market.

51.     A November 8, 2012 *Reuters* analysis of Standard & Poor's rating of Sprint following the announcement of the Proposed Transaction noted numerous possible future synergies from the transaction, including "cost savings on handsets and network equipment, and as a result of greater financial flexibility allowing consistently higher investment in the business."

52.     An October 28, 2012 analysis by Joan Lappin at *Forbes* noted the great deal SoftBank was receiving, in her article "Softbank's Brilliant Buy One (Sprint), Get One Free Deal (Clearwire)." In reference to Sprint's current 50.8% majority stake in Clearwire Corporation, following its early mid-October 2012 acquisition of the shares of Clearwire held by Craig O. McCaw's Eagle River Holdings, Lappin noted that for SoftBank, "The whole deal is about Clearwire and its V A S T spectrum position. That's the pot of gold and it comes with this deal almost for free, at least so far" (emphasis in the original). Lappin explained:

> So what is the lure? Sprint's much abused stepchild Clearwire is spectrum rich beyond the grandest dreams of any other U.S. carrier. It has 160 Mhz of spectrum in some markets and an average of 120 Mhz in the big urban markets where it really matters because that is where the traffic is that causes bottlenecks and poor service. The knock on 2.5Ghz is that it doesn't penetrate walls very well. One 800 Mhz cell site can propagate a signal across an extensive geographic area. But when conveying video and data streams in urban locales, what matters most is little interference and cross talk. Higher frequency spectrum is the winner in this battle when combined with lots of pico and nano cell sites. Clearwire can program as many as eight 20Mhz wide channels in an urban center. To be even more spectrally efficient, it doesn't have to offer 10 Mhz in each direction. Sprint is working hard to reclaim from its Nextel system bandwidth that will facilitate one 5×5 channel that can only be used as 5×5. There is simply no comparison in capacity.

By gaining control of Sprint, Softbank is now in the cat bird's seat. The offer is for only 70% of Sprint, an odd number. It is hard to know why 70% was chosen unless there is a plan for some future dilution from a public share sale or to use shares to make acquisitions that would reduce Softbank's share below 50%. Last year, Sprint officers made public statements implying they would be at the negotiating table if Clearwire were to be forced into bankruptcy. They seemed not to know that the spectrum it was after, would go to the bondholders and not to Sprint in a CLWR bankruptcy filing or bond default. At that same time, Sprint did know that a control position in Clearwire would set off cross defaults at Sprint pertaining to covenants on old bonds floated years ago by Nextel. Sprint went to great pains to give shares back to Clearwire's Treasury to reduce its economic interest below 50%. It retained the right, however, to reclaim those shares at a future time. And in about the most confusing set of partnership documents ever seen going back to 2008, Clearwire's various cable partners and founding partner Craig McCaw's Eagle River, have different voting and control rights than the public shareholders. It took Craig McCaw about 72 hours to cough up his shares to Sprint so that they could immediately resume more than 50% ownership after this Softbank Sprint deal was announced.

53.     Whatever the precise motives of the Japanese company, it is clear that SoftBank will gain enormous benefits and strategic advantage from the Proposed Transaction, benefits that have not been sufficiently incorporated into the deal provided to Sprint shareholders.

54.     In light of these significant synergies, SoftBank officers have not been shy about proclaiming their glee with the Proposed Transaction and the significant benefits SoftBank will gain from exploiting Sprint's role as a pioneer in the prepaid wireless and 4G markets, as well as its now majority stake in Clearwire, among other variables.   According to the *Wall Street Journal*, SoftBank Chairman and CEO Masayoshi Son noted in an October 15, 2012 investor conference call that: "So first, the immediate synergy that we're going to get together is the economy in total volume of purchasing smartphones and purchasing procurement of the network equipments."

55.     However despite these significant synergies inherent in the transaction for SoftBank, as noted by analysts across the country, and proclaimed by SoftBank's CEO himself,

the Board failed to secure a fair deal for the Company, either for the intrinsic value of its assets or the value of the Company's assets to SoftBank in a combined entity.

56.    Further, as noted by an audience member during Sprint's quarterly employee meeting on October 29, 2012, the transcript of which was filed with the SEC on Schedule DEF14A, Sprint stockholders are being forced to assume the risk of SoftBank defaulting on the billions of dollars of debt it will be acquiring to effectuate the deal. As the biggest overseas acquisition by a Japanese company ever, SoftBank will be financing the acquisition of Sprint with over $20 billion in syndicated loans. The enormous risk of default by SoftBank of this debt was underlined by the reaction of the Japanese market to the deal: SoftBank's biggest one-day decline of 17%, leading to the company losing $7 billion of its market value. Standard & Poor's also put its "BBB" long-term rating on SoftBank on credit watch with negative implications, saying  that the Proposed Transaction "may undermine Softbank's financial risk profile."

57.    As a result, in addition to the inadequate consideration, Sprint's shareholders are being asked to assume this enormous risk of default of billions of dollars of debt of the combined entity without adequate compensation.

***Sprint's Officers and Directors are Obtaining Special Benefits for Themselves***

58.    Instead of acting in the best interests of Sprint shareholders, the Company's executive officers and directors have material conflicts of interest and are acting to better their own personal interests through the Proposed Transaction.

59.    Pursuant to the Proposed Transaction, members of Sprint's management will be employed with the post-combination company.  For example, SoftBank has so far indicated that Individual Defendant Daniel Hesse, the current CEO of Sprint, will remain in that position in the

combined entity.   The combined entity's 10-member board of directors will also include three members from the current Sprint Board of Directors, in addition to Hesse.

60.     Further, pursuant to Section 2.10(d) of the Merger Agreement, the Company's officers and directors hold restricted stock and unvested stock options of Sprint that may vest in full and be converted into the right to receive the Proposed Transaction consideration if they are terminated due to the merger.

61.     Finally, as disclosed by Individual Defendant Hesse following a direct question from the audience during Sprint's quarterly employee meeting on October 29, 2012, the transcript of which was filed with the SEC on Schedule DEF14A, Hesse has a long-standing relationship with SoftBank and Masayoshi Son, founder and current CEO of SoftBank, indicating possible additional conflicts.

62.     Based on the above, the Proposed Transaction reflects an effort by the Individual Defendants and other Company insiders to aggrandize their own financial position and interests at the expense of and to the detriment of Sprint's public shareholders.

***The Preclusive Deal Protection Devices***

63.     In addition, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

64.     Section 5.3(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by SoftBank.  Section 5.3(d) also demands that the Company terminate any and all prior or on-going discussions with other potential acquirers.

65.     Pursuant to Section 5.3(c) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify SoftBank of the bidder's identity and the terms of the bidder's offer within 24 hours. In other words, the Merger Agreement gives SoftBank access to any rival bidder's information and allows SoftBank a free right to top any superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor SoftBank and piggy-back upon the due diligence of the foreclosed second bidder.

66.     Section 8.3 of the Merger Agreement provides that a termination fee of $600 million must be paid to SoftBank by Sprint if the Company decides to pursue a competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer. Additionally, Sprint must pay up to $75 million of SoftBank's expenses under specified conditions if the Merger is not consummated.

67.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

68.     The Proposed Transaction is wrongful, unfair and harmful to Sprint's public shareholders, and is not in the Company's or the shareholders' best interests.  As a result of the defendants' conduct, Sprint's public shareholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company.  The deal reflected in the Proposed Transaction does not represent the true inherent

value of the Company, and the deal protection devices are preclusive and prevent the Board from ensuring an acquisition that is in the Company's and the shareholders' best interests.

69.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

70.     Plaintiff repeats all previous allegations as if set forth in full herein.

71.     The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of Sprint and have acted to put their personal interests ahead of the interests of Sprint shareholders.

72.     The Individual Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the shareholders of Sprint because, among other reasons:

(a)     They failed to take steps to maximize the value of Sprint to its public shareholders and took steps to avoid competitive bidding;

(b)     They failed to properly value Sprint; and

(c)     They ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connections with the Proposed Transaction.

73.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Sprint's assets and will be prevented from benefiting from a value-maximizing transaction.

74.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

75.     The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

76.     Plaintiff and the Class have no adequate remedy at law.

**COUNT II**
**Aiding and Abetting**
**(Against Sprint and the SoftBank Subsidiaries)**

77.     Plaintiff repeats all previous allegations as if set forth in full herein.

78.     As alleged in more detail above, defendants Sprint and the SoftBank Subsidiaries have aided and abetted the Individual Defendants' breaches of fiduciary duties.

79.     As a result, Plaintiff and the Class members are being harmed.

80.     Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     Declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

(B)     Enjoining, preliminarily and permanently, the Proposed Transaction;

(C)     In the event that the Proposed Transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)     Directing that defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)     Awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     Granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL AND DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby demands a trial by jury of the above-captioned matter and designates the place of trial as Kansas City, Kansas.

Respectfully submitted,

COPLEY ROTH & WILSON, LLC

_____

PATRICK COPLEY              KS #20699
JASON P. ROTH               KS #20529
Lighton Tower
7500 College Blvd., Suite 700
Overland Park, KS  66210
(913) 451-9500; Fax: (913) 451-9501
E-mail:  patrick@crwlawyers.com
E-mail:  jason@crwlawyers.com
*Attorneys for Plaintiffs*

LEVI & KORSINSKY, LLP
Shannon L. Hopkins, NY Bar #4266003
Julia J. Sun, NY Bar #4239349
30 Broad Street, 24th Floor
New York, NY  10004
(212) 363-7500; Fax: (212) 363-7171
E-mail:  shopkins@zlk.com
E-mail:  jsun@zlk.com
*Attorneys for Plaintiffs*
*Motions for Admission Pro Hac Vice to be filed*